Opinion delivered March 12, 1887.

No. 2288.

## GUS BARBEE *v.* THE STATE.

1. HEARSAY EVIDENCE.—Over objection by the defense, a State's witness was allowed to testify that, after the commission of the offense, and in the absence of the accused, certain persons came to witness and made overtures for a compromise, inquiring how much money it would take, etc. There was no proof that these overtures were made by the authority or with the knowledge of the accused. *Held*, that the evidence was hearsay and inadmissible, and was calculated to prejudice the accused.

2. CHARGE OF THE COURT.—A jury in a felony case should always be instructed that they are the exclusive judges of the facts proved, and of the weight to be given to the testimony.

APPEAL from the District Court of Navarro. Tried below before the Hon. S. R. Frost.

The indictment was presented in January, 1886, and charged that the appellant, on August 31, 1885, made an assault upon Mrs. A. B. Briscoe, with the intent to rape her. Appellant was found guilty, and a term of two years in the penitentiary was assessed as his punishment.

T. F. Briscoe, for the State, testified that he was a resident of the county of Navarro, and the husband of Mrs. A. B. Briscoe, the lady alleged to have been assaulted by the defendant. He knows and identifies Gus Barbee, the defendant. Witness, at the time of the assault, was absent from his home, being at Dunn's, about seven miles distant. On Monday morning, August 31, 1885, a little after sun rise, witness went to Whitehead's, where defendant then lived, and told defendant that he, witness, was going to Dunn's to cut hay, and would be gone

several days,—that his family were sick, and he did not like to leave them alone,—and asked defendant to stay at his, witness's, house at night while he should be gone, and promised to pay defendant for doing so. Witness and the defendant were neighbors, and witness thought the defendant was a good friend of his. He told defendant to send for him if any of the children should get sick. Defendant told witness he did not want any pay, but witness nevertheless promised to pick cotton for defendant to compensate him for any time he should lose. Witness went to Dunn's and did not return home until late the following Friday evening. As soon as he entered the house his wife told him all that had occurred, and witness, the next morning, went to a justice of the peace and swore out a warrant for the defendant, who, however, was not arrested for six or eight months afterwards.

On his cross examination, the witness stated that he heard nothing of the alleged outrage until his wife told him of it when he got home. Witness did not remember that on the following Sunday J. P. Barbee and Whitehead came to his house, nor that he had any conversation with them on that Sunday. Subsequently, however, they did come, and witness conversed with them, but did not tell them the particulars. Mr. Meazel came to witness's house, and witness narrated to him some of the facts stated by Mrs. Briscoe.

On the re-direct examination of the witness, he stated that J. P. Barbee, with Meazel, came one Sunday evening and wanted to compromise the matter. Witness told him to wait until he, witness, got on the stand,—that that was the only way he would compromise. John and Billie Barbee came once to witness's house, and the latter asked witness how much money it would take to compromise. He said he came there for the defendant. Whitehead was there, and that was the only time Whitehead was there. This occurred during court, and about a year prior to this trial. Witness told Whitehead all, or nearly all, the particulars of the affair as they had been narrated by witness's wife.

Mrs. A. B. Briscoe, for the State, testified that her husband, T. F. Briscoe, had to leave home to work, and got the defendant to stay with her during his absence. Defendant came to her house about dark. She made down a pallet on the gallery, for him, and he lay down there to sleep with witness's little five year old boy. Witness went to bed with her three other little

children early in the night. While she had her baby in her arms, nursing it, the defendant came in and spoke to her in an indecent manner. Witness told him to go out and hush, and he said he would not. She started to get up, and he caught her by the shoulder and pushed her back on the bed. He tried to make her give up to him, but she told him she would die first. He told witness to behave herself, and not to wake up the children and have them bawling around there. She started to get up, and he threw her back on the bed with her baby in her arms. He said he would not leave, and that he came there for that purpose. Then he cursed her and told her not to tell her husband, and that he would kill her if she did. He then went out and lay down, and did not come back again. Witness got up, lighted a lamp, and sat up until day. Defendant got up and left the place about day light. Mr. West came by, and witness asked him to go after her husband, but, instead of doing so, he sent Mr. Philpot, who was working for him, to stay with her that night, and Philpot stayed every night until her husband's return.

Cross examined, the witness stated that she had been living in that neighborhood for four years. There was friendly feeling between her and the Barbee family. Defendant had not previously been visiting her in her husband's absence, nor been riding up and hitching his horse and staying in the house with her. At the time of the assault witness had been asleep, and the defendant called her and thus waked her up. He was undressed. After repeating much of her testimony in chief, the witness stated that she told Mr. West of the difficulty the morning after it occurred, and told her husband all about it. Witness positively denied that the defendant came to her house day after day prior to the difficulty.

C. S. West, for the State, testified that he passed by Briscoe's house the morning after the alleged difficulty. He saw Mrs. Briscoe, and she asked him to let Philpot come there and stay with her, and witness did so. Defendant was afterwards hunted by the officers. On cross examination, the witness stated that he knew defendant's horse, and thought he saw it it hitched at Briscoe's several times shortly before the alleged difficulty. He had seen defendant at Briscoe's several times, but could not say whether Briscoe was at home or not. On re-direct examination, the witness said he stopped at Briscoe's nearly every day to get water, and sometimes stopped two or three times a day. There

charge that the assault was made *with malice aforethought* was not fatal to the indictment." The question being settled in that case by the Supreme Court in an elaborate argument, I was willing to rest it there. But, holding the views I do, I deem it due myself to here declare that, in my humble judgment, the reasoning of Judge Gray, though coming from a jurist of the first ability, is not sound; and, if carried to its logical results, would hold to be sufficient other indictments declared by this and the Supreme Court to be fatally defective.

Let us examine the position of the learned judge in the Martin case. After citing several provisions of the code, he proceeds: "In accordance with these provisions, one of the requisites of an indictment is declared to be that 'the offense must be set forth in plain and intelligible words;' just as it is required that the offense be defined in 'plain language,' and also that the law defining it 'shall be construed according to the plain import of the language in which it is written,' etc. Applying these rules to the definition of the offense for which appellant was indicted, there seems to us no difficulty in understanding it. It is declared 'if any person shall assault another with intent to murder,' he shall be punished. An assault and murder are defined in other articles, by stating what acts and purposes constitute those offenses. Their meaning is definite and well understood. To constitute murder, the killing must have been done with malice aforethought; and, in an indictment for murder, that intent must doubtless be alleged, for the simple reason that it is so defined in plain language in the code. The charge of an assault with intent to murder clearly conveys to the mind that the party charged did make an attack on the party assaulted, under circumstances constituting the offense of an assault, and that he did so under the circumstances constituting the offense of murder—that is, the intent to kill with malice aforethought. If the language of the code in defining this offense is in plain language enough to be clearly understood, then it would seem to follow that an indictment charging a party in that language must be deemed to be in plain and intelligible words, and a sufficient compliance with the law."

From this citation it evidently appears that in any and all cases, owing to the peculiar provisions of our code bearing upon this subject, the indictment will be sufficient if it contains or follows the language of the statute defining the offense. The argument of the learned judge has for its object this conclusion

reserved by defendant, which recites as follows: "T. F. Briscoe was allowed by the court, over objections of the defendant, to testify as follows: 'John Barbee came with Meazel in a buggy to my house on Sunday evening after the assault, and wanted to compromise the matter. I told him to wait till I got on the stand; that was the only way I would compromise. John and Billie Barbee came again to my house last May. Billie Barbee asked me how much money it would take to compromise. He said he came there for the defendant.'" The defendant was not present when these overtures for a compromise were made. Defendant objected to this evidence upon the ground that it was hearsay, etc.

In an explanation appended to the bill of exception the trial judge gives as a reason for admitting said testimony that a part of the conversations between the witness, Briscoe and John and Billie Barbee had been drawn out by the defendant on the cross examination of said witness, and that, on re-examination of the witness by the State, it was competent to prove the whole of said conversation; and he refers to the statement of facts in support of his ruling. Upon examination of the statement of facts, it does not appear that any portion of said conversations was drawn out by the defendant. On the contrary, said statement shows that the only conversations, or parts of conversations, testified to by the witness Briscoe were drawn out by the prosecution on the re-examination of said witness.

We are of the opinion that this testimony was inadmissible. It was purely hearsay. It was not shown that the defendant had authorized John or Billie Barbee to make said statements, or any other statements, or to take any action whatever in relation to the transaction in which he was involved. He is in no way by the evidence connected with the acts and declarations of said parties, and can not be held responsible therefor, and should not be prejudiced thereby. (Langford v. The State, 9 Texas Ct. App., 287; Tyler v. The State, 11 Texas Ct. App., 388; Washington v. The State, 17 Texas Ct. App., 197; Favors v. The State, 20 Texas Ct. App., 155.)

That this illegal evidence was calculated to prejudice the rights of the defendant, there can be no question. The witness Briscoe, with whom the said conversations were had, was the husband of the woman alleged to have been assaulted, and the efforts of John and Billie Barbee to compromise the matter, as they stated, by authority of the defendant, with the representa-

tive of the injured party, would strongly tend to produce in the minds of the jury the belief that the defendant was guilty of the charge. It amounted almost to a confession of guilt.

There is but one objection that we perceive to the charge of of the court. It should have instructed the jury that they were the exclusive judges of the facts proved, and of the weight to be given to the testimony. (Code Crim. Proc., art. 728; Wilbanks v. The State, 10 Texas Ct. App., 642.)

Because of the error of the admission of illegal evidence, and the error mentioned in the charge of the court, the judgment is reversed and the cause is remanded.

In view of another trial of this cause, we deem it not improper to remark that while the evidence may be sufficient to support a conviction for an aggravated assault and battery, it leaves our minds in doubt as to the intent of the defendant in making the assault, whether his intent was to accomplish carnal knowledge of the woman by *force* or by *persuasion*. We are inclined to the opinion that the evidence in this particular is insufficient, but we refrain from so deciding. The judgment is reversed and the cause remanded.

*Reversed and remanded.*